MICHAEL D. BRUNO (SBN 166805)
RACHEL WINTTERLE (SBN 269853)
GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, California 94111
Telephone:   (415) 986-5900
Facsimile:    (415) 986-8054
mbruno@grsm.com
rwintterle@grsm.com

Attorneys for Defendant
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA
(erroneously sued as REGENTS OF THE UNIVERSITY OF CALIFORNIA)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANA KHATEEB, an individual,<br><br>Plaintiff,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA; PERMANENTE MEDICAL GROUP; KAISER FOUNDATION HEALTH PLAN, INC.; KAISER PERMANENTE SAN RAFAEL MEDICAL CENTER; KAISER PERMANENTE MEDICAL OFFICES; and DOES 1 THROUGH 10,<br><br>Defendants. | CASE NO.<br><br>**NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §1441(B) (FEDERAL QUESTION)** |

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

PLEASE TAKE NOTICE that Defendant THE REGENTS OF THE UNIVERSITY OF CALIFORNIA (erroneously sued as REGENTS OF THE UNIVERSITY OF CALIFORNIA) ("Defendant" or "The Regents") hereby removes to this Court the state court action described below.

1.      On June 4, 2024, an action was commenced in the Superior Court of the State of California in and for the County of Los Angeles, entitled *Sana Khateeb vs. Regents of the University of California; Permanente Medical Group; Kaiser Foundation Heal Plan, Inc.; Kaiser*

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, California 94111

*Permanente San Rafael Medical Center; Kaiser Permanente Medical Offices and Does 1-10,* Case No. 24STCV13968 (hereinafter "the Action"). A copy of the summons and complaint are attached hereto as **Exhibit A**.

2.       The Complaint was served on The Regents on June 10, 2024. The Complaint includes causes of action against The Regents for alleged violations of The Americans with Disabilities Act (the "ADA"), the Rehabilitation Act, and Title VI of the Civil Rights Act.

3.       Defendant Answered the Complaint on July 9, 2024.

4.       Pursuant to 28 U.S.C. § 1446(b)(3), this Notice of Removal is being filed within thirty (30) days from service of the Complaint on The Regents.

5.       The co-defendants, Permanente Medical Group; Kaiser Foundation Heal Plan, Inc.; Kaiser Permanente San Rafael Medical Center; and Kaiser Permanente Medical Offices (collectively the "Kaiser Defendants"), have also been served with the Complaint. The Kaiser Defendants consent to this removal.

6.       This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1331, and is one which may be removed to this Court by The Regents pursuant to the provisions of 28 U.S.C. § 1441(b) in that it arises under federal law pursuant to the ADA or 42 U.S.C. §§ 12101, *et seq.*; the Rehabilitation Act or 29 U.S.C. § 794; and Title VI of the Civil Rights Act or 42 U.S.C. § 2000d, *et seq.* ("Title VI").

7.       Accordingly, this Action presents claims arising under the laws of the United States, thereby conferring jurisdiction on this Court pursuant to 28 U.S.C. § 1331.

8.       In addition to jurisdiction over any of Plaintiff's claims arising under federal law, this Court has supplemental jurisdiction over any of Plaintiff's related state law claims. Specifically, 28 U.S.C. § 1367 confers jurisdiction to this Court over all claims which form part of the same case or controversy as the claim(s) over which the Court has original jurisdiction.

9.       Plaintiff's supplemental state law claims in the Complaint stem from the same common set of alleged facts and circumstances involving the alleged ADA, Rehabilitation Act and/or Title VI violations.

10.       Venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2) because the

**Gordon Rees Scully Mansukhani, LLP**
315 Pacific Avenue
San Francisco, California 94111

DEFENDANT THE REGENTS OF THE UNIVERSITY OF CALIFORNIA'S NOTICE OF REMOVAL

events giving rise to Plaintiff's Complaint are alleged to have occurred in San Rafael, California and Petaluma, California, and at the time the alleged events occurred, Plaintiff was a student at the University of California, San Francisco. Further, according to the Complaint, Plaintiff resides in San Jose, California, within this District. Defendants are also located within this District.

11.    Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal, without exhibits, will be promptly served on Plaintiff's counsel.

12.    A copy of this Notice of Removal, without exhibits, will also be filed with the Clerk of the Superior Court of the State of California in and for the County of Los Angeles.

**WHEREFORE,** The Regents respectfully removes this Action from the Superior Court of Los Angeles to this Court, pursuant to 28 U.S.C. § 1441.

Dated: July 10, 2024                          GORDON REES SCULLY MANSUKHANI, LLP

Michael D. Bruno
Rachel Wintterle
Attorneys for Defendant
THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA (erroneously sued as
REGENTS OF THE UNIVERSITY OF
CALIFORNIA)

# EXHIBIT A

Accepted on Behalf

**SUMMONS** of the Regents Only

**SUM-100**

*(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

Adrian Criley
6/10/2024

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Regents Of The University Of California; Permanente Medical Group; Kaiser Foundation Health Plan, Inc.; Kaiser Permanente San Rafael Medical Center; Kaiser Permanente Medical Offices; And Does 1 through 10,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

SANA KHATEEB, an individual,

Electronically FILED by
Superior Court of California,
County of Los Angeles
6/04/2024 5:53 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By C. Cervantes, Deputy Clerk

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

The name and address of the court is:
*(El nombre y dirección de la corte es):* Stanley Mosk Courthouse

111 North Hill Street, Los Angeles, CA 90012

CASE NUMBER:
*(Número del Caso):*
**24STCV13968**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Nicholas Jurkowitz; Fenton Jurkowitz Law Group, LLP; Esq. 1990 S. Bundy Drive, Suite 777, Los Angeles, CA 90025

DATE: 06/04/2024
*(Fecha)*

Clerk, by   David W. Slayton, Executive Officer/Clerk of Court, Deputy
*(Secretario)*   C. Cervantes *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):*   REGENTS OF THE UNIVERSITY OF CALIFORNIA

under: ☒ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

[SEAL]

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

Nicholas Jurkowitz, State Bar No. 261283
Anne Schneider, State Bar No. 333408
**FENTON JURKOWITZ LAW GROUP, LLP**
1990 S. Bundy Drive, Suite 777
Los Angeles, CA 90025
Telephone: (310) 444-5244
Facsimile: (310) 444-5280

Attorneys for Plaintiff
SANA KHATEEB

Electronically FILED by
Superior Court of California,
County of Los Angeles
6/04/2024 5:53 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By C. Cervantes, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| SANA KHATEEB, an individual,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA; PERMANENTE MEDICAL GROUP; KAISER FOUNDATION HEALTH PLAN, INC.; KAISER PERMANENTE SAN RAFAEL MEDICAL CENTER; KAISER PERMANENTE MEDICAL OFFICES; and DOES 1 THROUGH 10,<br><br>                    Defendant. | Case No.: 24STCV13968<br><br>**UNLIMITED CIVIL CASE**<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. **VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. §§ 12101 ET SEQ.)**<br><br>2. **VIOLATION OF THE REHABILITATION ACT (29 U.S.C. § 794)**<br><br>3. **CALIFORNIA GOVERNMENT CODE § 11135**<br><br>4. **VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964 (42 U.S.C., § 2000d ET SEQ.)**<br><br>5. **VIOLATION OF UNRUH CIVIL RIGHTS ACT**<br><br>**JURY TRIAL DEMANDED** |

1  **I.     INTRODUCTION**

2       1.      This action is brought by Plaintiff, Sana Khateeb ("Plaintiff") who is suing her

3  public university, the University of California, San Francisco ("UCSF") as Defendant the Regents

4  of the University of California, and Defendants the Kaiser Foundation Health Plan, Inc. ("KFHP"),

5  and the Permanente Medical Group ("PMG") for their illegal acts of discriminating against her on

6  the basis of her race and disability in violation of the Americans with Disabilities Act ("ADA");

7  California Government Code § 11135; violation of the Rehabilitation Act; and Violation of VI of

8  the Civil Rights Act ("Title VI").

9  **II.    PARTIES**

10      2.      *Plaintiff* Sana Khateeb is a resident of San Jose, California attending pharmacy

11  school at UCSF.

12      3.      *Defendant* the Regents of the University of California ("Regents") is a public entity,

13  specifically a California Public Corporation. UCSF and the School of Pharmacy at UCSF (the

14  "Program") is operated, owned, managed, and controlled by the Regents.

15      4.      *Defendant* the Kaiser Foundation Health Plan, Inc. ("KFHP"), is a corporation that

16  does business in California.

17      5.      *Defendant* the Permanente Medical Group ("PMG") is a California corporation that

18  practices medicine in Northern California. As of December 2023, PMG served 4.6 million

19  members, and had a total of 21 hospitals, and 209 medical offices/outpatient facilities.[1] PMG is a

20  for-profit entity that has a mutually exclusive contract with KFHP for the provision of health

21  services to KFHP members.

22      6.      *Defendants* Kaiser Permanente San Rafael Medical Center (located at 99 Montecillo

23  Road in San Rafael, California 94903), and Kaiser Permanente Medical Offices (located at 3900

24  Lakeville Hwy, Petaluma, CA 94954) are corporations doing business in California. Kaiser

25  Permanente San Rafael Medical Center, and Kaiser Permanente Medical Offices are subsidiaries of

26  KFHP and PMG.

27  _____

28  [1] https://permanente.org/the-permanente-medical-group-inc/

1        7.      *Defendant* Does 1 through 10, inclusive, are other persons and entities that are

2   responsible in some measure for the actions complained of herein.  Their names are unknown at this

3   time and they are therefore being sued under their fictitious names.  At such time as their true names

4   are ascertained, this complaint will be amended to so reflect.

5        8.      Plaintiff alleges on information and belief that all Defendants were agents, parents,

6   subsidiaries and/or affiliates of each other, whether actual, constructive or apparent, in doing the

7   things hereafter described by the authority of, and in the scope of that agency, and all acts and

8   omissions as described below were ratified by each of the other Defendants in this action such that a

9   fraud and/or injustice will occur if the alter ego doctrine is not applied.

10  **III.    FACTUAL SUMMARY**

11       **A.    Plaintiff's Educational Background**

12       9.      In June 2014, Plaintiff graduated from Mills College ("Mills") in Oakland, California

13  with a B.A. in Molecular Cell Biology.

14       10.     In May 2017, Plaintiff received her Masters of Science in Biological Sciences from

15  the Dominican University of California in San Rafael, California ("Dominican").

16       11.     In her academic career, Plaintiff has co-authored at least ten academic publications.

17       **B.    Plaintiff's Protected Status**

18              **i.    Plaintiff's Status as a Qualified Individual with a Disability**

19       12.     Plaintiff was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") in

20  June 2013. In order to be diagnosed, Plaintiff underwent a full psychoeducational evaluation

21  conducted by a Mills College psychologist. Plaintiff received academic accommodations for her

22  disabilities at Mills which included, taking her exams in a private, quiet testing room, along with an

23  additional double-time to take her exams. Plaintiff also received accommodations at Dominican

24  which included additional time to take her exams. Plaintiff disclosed her disabilities to the Program

25  and met with the acting Director of the UCSF Student Disability Services Office ("SDS"), Mr. T.M.

26  ("T.M.") and was afforded the same accommodations as Mills. Plaintiff started taking medication to

27  manage her ADHD while at Mills in 2014.

28       13.     Plaintiff was diagnosed with Adjustment disorder with Anxiety and Depression in

1   February 2022 while at UCSF. Plaintiff began taking medication to manage her anxiety, depression,

2   and adjustment disorders while at UCSF shortly after being diagnosed.

3           **ii.    Plaintiff's Racial-Ethnic Profile**

4           14.     Plaintiff is a Palestinian-American, female. Plaintiff has black/dark brown hair;

5   brown eyes; and olive skin. Throughout Plaintiff's life, individuals have assumed that she is of East-

6   Asian/Indian descent.

7       **C.    <u>Plaintiff's Pharmacy School Education at UCSF</u>**

8           15.     Plaintiff began her pharmacy school education in July 2021 at the UCSF School of

9   Pharmacy located in Northern California. The pharmacy school has three main campuses located in

10  the Parnassus, Mission Bay (the "Main Campus") and Laurel Heights neighborhoods of San

11  Francisco, California.

12          16.     Students in their first year of the Program spend most of their time at the Main

13  Campus. However, Plaintiff's first year was primarily remote due to the COVID-19 pandemic, and

14  as such, she attended lectures and examinations virtually, from her computer at home.

15          17.     Students in their second year of the Program spend most of their time at Main

16  Campus attending lectures and workshops. However, Plaintiff attended her lectures and workshops

17  primarily over Zoom from home, and attended in-person workshops roughly twice a week due to

18  the COVID-19 pandemic.

19          18.     Prior to her third year, Plaintiff had extremely limited interactions with other

20  individuals in the Program, including her peers and Program leadership, due in large part to the

21  COVID-19 pandemic.

22          19.     Students participate in a total of eight, six-week-long rotations in their third year. At

23  the beginning of their second year, students select their third-year rotations. Students are made

24  aware of their rotations in the winter of their second year. The process for selecting rotations starts

25  with a survey from the Program. Students first rank the location they would like to rotate in (e.g.,

26  Sacramento or Los Angeles) so that they may prepare accommodations in that geographical for the

27  year. Plaintiff was assigned to the North Bay region, and commuted to her rotation sites—primarily

28  located in San Rafael, California—from her apartment in San Jose, California.

20.     Each geographical area available for rotation has assigned to it a UCSF preceptor. The UCSF preceptor is an individual who oversees the sites and students assigned to rotations in a given geographical area.

21.     Once students are placed in a particular geographical location, students receive a second survey where they can select which hospital or private pharmacy they prefer to rotate, as well as the specialty they prefer to rotate in (e.g., Kaiser Oncology Pharmacy or Walgreens Community Outpatient Pharmacy). Students are required to select one Advanced Pharmacy Practice Experience ("APPE") from each of the following categories: CP 192- Hospital Pharmacy Systems and Practice Experience; CP 193- Community Pharmacy Systems and Practice Experience; CP 194- Acute Care Experience; and CP 195- Ambulatory Care Experience.

22.     Each individual rotation *site*, has at least one site-preceptor assigned to it. The site-preceptor is an individual who trains, grades, and evaluates each student at a given site. Site preceptors are employed and/or work in collaboration with UCSF and the Program to train pharmacy students.

       **i.     Plaintiff's Rotation at Kaiser Community Pharmacy in San Rafael**

23.     In May 2023, Plaintiff began her first rotation at the Kaiser Community Pharmacy in the Kaiser Permanente San Rafael Medical Center ("Kaiser Community") located at 99 Montecillo Road in San Rafael, California 94903. This site satisfied Plaintiff's Community Pharmacy Systems and Practice Experience requirement upon completion of her rotation there. Plaintiff commuted approximately 90 miles between San Jose and San Rafael on a daily basis.

24.     In May 2023, Ms. K.B. ("K.B.") was the acting UCSF preceptor assigned to the North Bay region. K.B. is a Caucasian middle-aged, female.

25.     In May 2023, Ms. T.H. ("T.H.") was the acting site-preceptor at Kaiser Community. T.H. is a young, Asian-American female.

26.     On May 15, 2023, which was Plaintiff's first day at her Kaiser Community rotation, Plaintiff was given an orientation by T.H., and she began her work on the floor of the pharmacy.

27.     Shortly after Plaintiff's lunch break on her first day, Plaintiff was summonsed to T.H.'s office, and informed that a technician at the site had "complained about [Plaintiff's] scent."

1  Plaintiff was not given the identity of the technician who made the complaint. Plaintiff was
2  perplexed by this complaint because she did not work in close proximity to the technicians during
3  the course of her day. T.H. reassured Plaintiff that she did not smell anything bad on Plaintiff
4  herself, but that the technician who had complained was "sensitive to scent." T.H. then advised
5  Plaintiff to try "dry cleaning her white coat," in order to eliminate any odor.

6      28.    Over the weekend, Plaintiff dry cleaned her white coat, and arrived the next working
7  day at her site with the clean coat. At the start of the day, T.H. inquired as to whether Plaintiff had
8  dry cleaned her coat, and Plaintiff confirmed that she had. A few moments later, T.H. called
9  Plaintiff into her office to inform her that in the few minutes she had arrived that day that the same
10 technician complained about Plaintiff's scent again. T.H. inquired as to whether Plaintiff had a
11 clean change of clothing in her car that she could switch into, and Plaintiff informed T.H. that she
12 did not. At the end of the day, T.H. called Plaintiff into her office again, and requested that Plaintiff
13 bring with her a separate set of clothing that she could "smell" prior to her entering the work place
14 the following day. Plaintiff was asked to bring a bag of clean clothing, in addition to the clothing
15 she was already-wearing on her person that day.

16     29.    As directed, when she arrived at work the following day, Plaintiff arrived wearing a
17 set of professional clothing under her white coat, and brought with her a bag of additional
18 professional clothing. T.H. smelled the clothing in the bag, and directed Plaintiff to change into that
19 clothing. Approximately twenty minutes after this interaction, T.H. approached Plaintiff to inform
20 her that she had received yet *another* complaint about Plaintiff's scent. T.H. requested that Plaintiff
21 wear a white coat provided by Kaiser on that day. From that day forward, T.H. provided Plaintiff
22 with a fresh white coat every morning, which she would leave at the site at the end of the day to be
23 laundered.

24     30.    In response to the technician's complaints about Plaintiff's smell, T.H. arranged for
25 Plaintiff to rotate one day out of the week at the Kaiser San Rafael Park Pharmacy ("Kaiser San
26 Rafael Park") located at 1650 Los Gamos Drive in San Rafael, California 94903. Plaintiff never
27 received a single complaint at Kaiser San Rafael Park.

28     31.    At 4:10 PM on May 24, 2023, Plaintiff texted K.B. to request they meet to discuss

the challenges she was facing at Kaiser Community. Later that night, Plaintiff spoke on the phone with K.B., and shared with her the events of the past few days. In response, K.B. advised Plaintiff to communicate with T.H. about "how she was feeling," and encouraged Plaintiff to "handle the situation on her own." Plaintiff requested a group meeting with T.H. and K.B. to further discuss the situation, and K.B. reluctantly accepted.

32.     On May 25, 2023, Plaintiff arrived to Kaiser Community, and informed T.H. that she had spoken with K.B. about the "scent" issue, and that she requested a meeting between the three of them. T.H. consented, but due to scheduling conflicts the parties did not meet that day, and never met. Later that day, T.H. informed Plaintiff that "two of her technicians complained and had to go home because of [Plaintiff's] scent." T.H. further advised Plaintiff that if she could not get her "smell under control" she would have to "fail [Plaintiff]." Plaintiff responded in saying that she would be willing to do anything to resolve the situation, at which point T.H. requested that she be able to smell Plaintiff before she entered the work floor every day. Plaintiff felt she had no choice but to consent for fear of failing her rotation.

33.     From that day forward, Plaintiff would enter the facility in the morning and head straight to T.H.'s office so that she could smell her body and hair. Each and every day, T.H. would allow Plaintiff to enter, and remark that Plaintiff "did not smell" in her opinion. At some point, the Lead Technician for the site was recruited to participate in this morning scent ritual. However, the situation did not approve, and almost every day there was another problem and new restriction placed on Plaintiff. Likewise, almost every day Plaintiff would call K.B. to complain about the worsening work environment and harassment she endured at Kaiser Community. K.B. always gave Plaintiff the same advice that she "must work with T.H. to resolve the issue." When Plaintiff asked if she could be moved to a different site for the remainder of the rotation, K.B. informed her that she could not as no other sites had any availability left for students.

34.     One day shortly after Plaintiff arrived, she noticed the technicians were shouting at the top of their lungs on the pharmacy floor. On that same day, Plaintiff noticed the technicians coming closer to her and her workspace than necessary, and than they had in days prior. In front of all of the pharmacists, technicians, and students present that day, T.H. suddenly approached

1   Plaintiff and yelled "Sana what is going on?! Come to my office right now! Why are you going near
2   the technicians?" T.H. then informed Plaintiff that she should "stay away" from the technicians
3   because they are "complaining every day."

4       35.    Later that day one of the technicians approached Plaintiff from behind as she was
5   standing at a shelf putting materials away. Plaintiff became aware of the technician's presence
6   because she exclaimed, "Indian," incorrectly referring to Plaintiff's ethnicity before abruptly
7   walking away. Plaintiff informed T.H. about the racially-charged incident, and the Lead Technician
8   was present for this interaction. Although T.H. remained silent, the Lead Technician shouted at
9   Plaintiff, "You have to understand where [the technician] is coming from! She could have
10  respiratory damage as a result of this!" T.H. continued to reassure Plaintiff that she did not smell
11  any odor on her person. No actions were taken by Kaiser or UCSF personnel in response to the
12  "Indian" comment made at Plaintiff.

13      36.    That same day, Plaintiff contacted K.B. regarding the "Indian" comment, and was
14  not able to speak with her until the weekend—which was her next availability to talk. When
15  Plaintiff relayed the incident to K.B., her advice to Plaintiff was to "stick it out" for the rest of the
16  rotation, and to "take it in stride, so that she could pass the rotation and put it all behind her."
17  Plaintiff again asked if there was any way she could be moved to a different rotation site, and K.B.
18  declined for the same reasons as before. K.B. informed Plaintiff that the alternative was that she
19  could repeat the rotation next year. Feeling she had no other choice, Plaintiff reluctantly agreed to
20  continue working at Kaiser Community.

21      37.    Around the same time, Plaintiff contacted T.M. to request that she be moved out of
22  the site as her anxiety was worsening as a result of the daily harassment she endured. T.M. escalated
23  a complaint regarding Plaintiff's situation to Program leadership. To T.M.'s great surprise, K.B. had
24  not escalated any of Plaintiff's complaints to her superiors at UCSF, and administration was largely
25  unaware of the events that were transpiring between Plaintiff at Kaiser Community until that point.
26  Ultimately, T.M. and K.B. agreed that K.B. would check in on Plaintiff more frequently, and
27  nothing further was done.

28      38.    The next day, Plaintiff proceed to T.H.'s office to perform the morning scent-test

1  ritual. On that particular morning, T.H. informed Plaintiff that she had spoken to K.B. regarding the
2  "Indian" incident, and that she and K.B. had determined that Plaintiff would no longer work inside
3  the pharmacy at the same time the technicians were there. Plaintiff was given a mobile phone, and
4  stationed outside of the pharmacy, where she would receive calls to deliver medication that she
5  would walk next door to the Kaiser hospital. Only at the end of the day, after the technicians went
6  home, would she be permitted to enter and fill prescriptions for the remainder of her work day.
7  Some days, she would stay an hour later in order to finish filling the prescriptions she was
8  responsible for on a given day.

9       39.    Still, the restriction that Plaintiff could not be in the pharmacy at the same time as the
10  technicians was not enough. T.H. informed Plaintiff that in the short amount of time she entered the
11  pharmacy to obtain prescriptions for delivery, that the technicians were still offended by her scent.
12  As a result, T.H. set up a line of duct tape on the pharmacy floor to indicate the place where
13  Plaintiff was required to stop when entering the pharmacy. That is, Plaintiff was not allowed to pass
14  the line when the technicians were present in the pharmacy when waiting for prescriptions to pick
15  up for delivery. The medications for delivery were handed to Plaintiff from behind the duct-tape
16  line by non-technician pharmacy staff. Additionally, when Plaintiff arrived every morning from that
17  point forward, she was mandated to stand in a specific area outlined by duct tape in the locker room
18  when putting her valuables and personal belongings in the locker for safe-keeping for the day. The
19  line of duct tape in the locker room limited where Plaintiff was permitted to walk within the locker
20  room, and purported to separate her from the other staff. This made little sense to Plaintiff, as scent
21  is airborne, and if she truly smelled so offensive it was unclear why a duct tape line would stop the
22  travel of that scent. Furthermore, it was unclear why the only individuals who allegedly perceived
23  her as having an offensive smell were the same individuals who referred to her as having an "Indian
24  scent."

25       40.    Throughout this entire ordeal, T.H. consistently threatened Plaintiff that if she did
26  not improve the situation she would not pass this rotation. However, T.H. admitted that she did not
27  understand the problem, nor did she perceive Plaintiff to smell bad in any way. It was only the
28  technicians who perceived Plaintiff as having an "offensive Indian scent."

1        **ii.    Plaintiff's Discriminatory Removal from Kaiser Community Pharmacy in**

2               **the Last Two Weeks of Her Rotation**

3        41.    On June 8, 2023, just two weeks before she was set to finish her rotation at Kaiser

4   Community, Plaintiff was informed that she could no longer work at Kaiser Community. T.H.

5   called Plaintiff on the phone after delivering medications that morning and asked to meet with her

6   in person, outside of the pharmacy at 3:00 PM. There, T.H. informed Plaintiff that she was unable

7   to manage the "situation with the technicians," and that Plaintiff would need to find an alternative

8   work site to finish out her rotation in the final weeks. T.H. completed Plaintiff's work evaluation on

9   the spot, passed her, and provided her with a list of alternative pharmacies where she could work for

10   the rest of the rotation. T.H. also apologized, and again reassured Plaintiff that T.H. personally did

11   not smell anything offensive on Plaintiff's person, and did not understand the technicians' strong

12   responses.

13        42.    For the final two weeks of her Kaiser Community rotation, Plaintiff floated at three

14   separate pharmacy locations all in North Bay. One of those pharmacies was Kaiser Permanente

15   Petaluma Pharmacy within the Kaiser Permanente Medical Offices ("Kaiser Petaluma") located at

16   3900 Lakeville Hwy, Petaluma, CA 94954. The pharmacist in charge at Petaluma—Mr. J.Y.

17   ("J.Y.")—informed Plaintiff that he was briefed on her situation at Kaiser Community. Shortly after

18   starting her work, Plaintiff was summonsed to J.Y.'s office where he and the lead pharmacy

19   technician at Kaiser Petaluma were waiting of her. They informed Plaintiff that she had a "strong

20   scent"—this time an alleged "floral scent"—that was offensive to the technicians, asked if she had a

21   change of clothing (which she did), and then sent her home with the request that she not return. J.Y.

22   informed Plaintiff that T.H. would talk to Plaintiff about "next steps." At this time, J.Y. also

23   inquired as to whether Plaintiff was using Fabuloso—a household cleaner with a distinct scent—in

24   order to clean her home. Plaintiff reported this behavior to T.M., who reassured Plaintiff that she

25   "didn't smell bad," and that the technicians were "ganging up on her because of her race." T.M.

26   reported this to UCSF leadership, who acknowledged that this was a race issue, but still took no

27   steps to mitigate her situation or to address the issue.

28        43.    The next day, Plaintiff arrived at the Kaiser Permanente, Downtown San Rafael

1   Pharmacy within the Kaiser Permanente Downtown San Rafael Medical Offices—3rd Street

2   ("Kaiser Downtown") located at 1033 3rd Street in San Rafael, California 94901, which was a

3   relatively small pharmacy. When she arrived, she was relieved to find that the pharmacist in charge

4   there—Mr. S.I. ("S.I.")—was himself Indian. Plaintiff begged S.I. to allow her to complete her

5   rotation at Kaiser Downtown, and informed him about the technicians at Kaiser Petaluma and

6   Community who bullied her because of her alleged "Indian scent." S.I. informed Plaintiff that he

7   too once worked at Kaiser Community, and that the main technician who made complaints about

8   Plaintiff had also made complaints about him. Specifically, the main technician at Kaiser

9   Community "didn't want him around her." S.I. was informed that because the main technician had

10  been there for about a decade, and was protected by the union, there was nothing that could be done

11  in spite of the fact that she was extremely difficult to work with according to many Kaiser

12  Community employees. S.I. moved to Kaiser Downtown as a result of the unfair complaints lodged

13  against him at Kaiser Community by the technicians. Both S.I. and a technician working at Kaiser

14  Downtown that day informed Plaintiff that the main technician who made complaints about Plaintiff

15  at Kaiser Community, "doesn't like people who aren't her kind." The technician told Plaintiff that

16  she too had problems with the main technician who made complaints about Plaintiff at Kaiser

17  Community when she worked at Kaiser Community in the past.

18      44.     Plaintiff also informed S.I. what happened at Kaiser Petaluma. S.I. told Plaintiff that

19  the Kaiser Petaluma technicians were close friends with the Kaiser Community technicians, and that

20  they supported one another.

21      45.     S.I. informed Plaintiff that Kaiser Downtown did not have room for another full-time

22  student.

23      46.     With nowhere to go to complete her rotation in the final weeks, Plaintiff called K.B.

24  and asked her for direction. K.B. advised Plaintiff that she could shadow Ms. S.H. ("S.H.") who

25  was the Drug Education Coordinator, PGY1 Pharmacy Residency Program Coordinator, and

26  Pharmacy Student APPE Program Coordinator for Kaiser San Rafael area. For one full day Plaintiff

27  drove around with S.H. and delivered prescriptions. The following day S.H. informed Plaintiff that

28  she had asked her to drive around with her for the day solely so that she could assess whether

1   Plaintiff had an offensive scent. S.H. notified Plaintiff that she did have a scent, but that it did not

2   bother her, and was not offensive. Plaintiff felt extremely violated. S.H. lied to her about the reasons

3   for taking her in the car with her. S.H. apologized to Plaintiff, but proceeded to ask her if she puts

4   oils in her hair that could cause her to smell. Shortly thereafter, Plaintiff called K.B. to confront her

5   about the driving incident, and K.B. apologized.

6       47.    With only three days or so left in her rotation, Plaintiff contacted Program leadership

7   and notified them that she had a terrible experience in the Program, as she was discriminated

8   against, and robbed of the ability to learn. Feeling that she had no other choice, Plaintiff requested

9   not to work at Kaiser Permanente locations for the remainder of the Program. Plaintiff then moved

10   to San Jose, California.

11       48.    On June 21, 2023, UCSF leadership contacted Plaintiff and directed her to talk to the

12   UCSF Office for the Prevention of Harassment and Discrimination (the "OPHD"). OPHD ensured

13   Plaintiff that that they would conduct an investigation into the racially charged events that had

14   transpired at Kaiser Community and Petaluma. On November 29, 2023, OPHD emailed Plaintiff to

15   inform her that the matter was closed because she would no longer be working with Kaiser

16   Permanente through the Program and it incorrectly deemed the issue as having been resolved.

17       49.    For the remainder of the Program, the Program executively selected Plaintiff's

18   rotation sites and electives, all of which have been located in San Francisco, California. Plaintiff's

19   UCSF preceptor is no longer K.B. but instead the UCSF preceptor for the East Bay area, Ms. T.C.

20   ("T.C.").

21            **iii.**    **The Program's Disability Discrimination Against Plaintiff**

22       50.    In or about mid-July 2023, Plaintiff was contacted by Program leadership and

23   informed that her next rotation would be acute-care neurology ("Neurology") at the UCSF Medical

24   Center located at 505 Parnassus Avenue in San Francisco, California. August 7, 2023 was

25   Plaintiff's first day in Neurology, and she met her site preceptor, Ms. L.R. ("L.R."). Plaintiff met

26   L.R. in her second year, as L.R. was one of Plaintiff's instructors for a month-long course that met

27   once a week.

28       51.    Plaintiff observed L.R. to be particularly attentive to the other pharmacy student who

was rotating at the site at the time, even assigning her a physician to shadow. L.R. assigned the other rotating student *two* doctors to shadow during the rotation. Plaintiff asked L.R. if she could be assigned to shadow a physician as well. Instead, Plaintiff was assigned a patient who had just endured an eight-hour back surgery, and who did not speak any English. Plaintiff waited hours, and even stayed later than expected of her, to collect information about the patient's medications from relatives who spoke English in order to complete her assignment. The next day, Plaintiff presented the information she gathered to L.R. who was upset that Plaintiff had "took so long" to obtain the information, in spite of Plaintiff's reasonable explanation regarding the delay. Plaintiff was never given a physician to shadow during the entirety of her rotation.

52. Later that same week, Plaintiff was called into the pharmacists' office by a pharmacist who worked with L.R.—Ms. I.C. ("I.C."). I.C. and another pharmacist were present in the office when Plaintiff arrived. I.C. informed Plaintiff that L.R. had problems with her, which had transpired, "since last year." I.C. informed Plaintiff that she was "too slow" and that "all the other pharmacists feel the same way." Plaintiff was confused because she had only been there for less than a week when she received this news. Plaintiff inquired as to whether this had anything to do with her disability. L.R., like all the other instructors working with Plaintiff in the Program, had received paperwork from SDS pertaining to Plaintiff's disability prior to working with her, and had awareness of her disability when she started Neurology.

53. I.C. asked Plaintiff for any paperwork pertaining to her disabilities, and for a description of the nature of her disabilities. Plaintiff explained that her ADHD necessitated her having extra time to complete certain tasks, including examinations. At this point, Plaintiff began to cry, and I.C. dismissed the other pharmacist present in the room. I.C. then inquired as to whether Plaintiff was taking medications for her disabilities. When Plaintiff said she was, I.C. replied, "I just want to let you know that you're not going to pass." Plaintiff was shocked and was not sure how I.C. could make that determination so early on in her rotation. Plaintiff contacted T.C. directly to inform her of the events that had transpired. T.C. advised Plaintiff to talk to L.R. directly about the issue, and report back to her.

54. Next, Plaintiff approached L.R. about the situation. L.R. replied that she *was* "having

- 13 -
**COMPLAINT**

1    those concerns," and that even if she has a disability, Plaintiff would "still need to get her

2    assignments done." L.R. agreed to start fresh, and Plaintiff informed T.C. of the results of their

3    conversation. T.C. requested that Plaintiff report back to her in three weeks around the time of mid-

4    point evaluations in the rotation.

5            55.     For the remainder of her time in Neurology, Plaintiff was largely denied the

6    opportunity to work on patient cases by L.R., I.C., and the other pharmacists at the location in spite

7    of her repeat requests. Meanwhile, the other student assigned to the rotation was regularly given

8    patients and physicians to shadow.

9            56.     After a while, Plaintiff confronted L.R. about this dynamic who informed Plaintiff

10   that she "could not be trusted" to manage the work, and thus the pharmacists chose to give it to the

11   other student, and further that she was "too slow." Plaintiff stated that she is trying to manage her

12   tasks better, but that her ADHD can sometimes cause her to perform tasks slightly slower than

13   others, but that she can improve with practice.

14           57.     On one occasion, L.R. commented to Plaintiff that "people who have ADHD do not

15   have a real disability—they're just lazy, and spend too much time on their phone, and watching

16   television, and that's why they think they have ADHD." L.R. insisted that people who have ADHD

17   do not need medication. Because Plaintiff had disclosed her disabilities to L.R. at the beginning of

18   the rotation, and she was aware of Plaintiff's anxiety and ADHD prior to making those comments.

19           58.     Throughout her time in Neurology, and almost on a daily basis, Plaintiff was

20   informed by I.C. and L.R. that she "would not pass" because she was "too slow."

21           59.     Midway through the rotation, Plaintiff informed T.C. that L.R. was going to fail her

22   because she was "too slow," and further that L.R. attributed this to Plaintiff's disability. In response,

23   L.R., T.C., and Plaintiff had a meeting to discuss next steps and problem solve. At this meeting,

24   L.R. put on paper a plan for Plaintiff to pass that consisted of Plaintiff working on several patient

25   cases with the expectation that she present those cases as she completes them throughout the

26   remainder of the rotation.

27           60.     Throughout the remainder of the rotation, Plaintiff was careful to regularly update

28   L.R. as she completed each patient case required of her. L.R. consistently reassured Plaintiff that

1   she was "doing a great job," and that she "was improving." By the end of the rotation, Plaintiff had
2   successfully completed the tasks outlined in the plan by L.R. for her, and presented all the cases
3   required of her.

4        61.   On the last day of her Neurology rotation, Plaintiff was informed by L.R. that she did
5   not pass. When Plaintiff asked for a reason, L.R. informed Plaintiff that she was "still too slow,"
6   and that "maybe if she had more time to grade her, the result would be different." Plaintiff
7   responded in saying that her ADHD sometimes required her to take more time to complete certain
8   task—a fact that L.R. had been aware of since the start. L.R. suggested that Plaintiff come in on
9   Saturday and Sunday of that week in exchange for L.R. passing her. This was in spite of the fact
10  that Plaintiff's Neurology rotation had ended on Friday of that week.

11       62.   On Friday night of that week, L.R. emailed Plaintiff a news article about a doctor
12  who made a mistake regarding a medication resulting in the patient being put in harm's way. On
13  Saturday, L.R. remarked that Plaintiff would end up like the doctor in the article because she
14  "wasn't capable of being a pharmacist." Plaintiff worked on Saturday and Sunday of that week for
15  10 hours without taking a lunch break.

16       63.   The following Monday, Plaintiff spoke to T.C. on the phone. T.C. informed Plaintiff
17  that she should not have been at the site on the weekend, and that she did not pass the rotation, and
18  then hung up the phone.

19       64.   Because Plaintiff did not pass Neurology, the Program informed her that it would be
20  required to delay the receipt of her pharmacy degree; she would be required to repeat the rotation;
21  and to pay for an extra semester. This also delayed Plaintiff's ability to: apply to residency, and to
22  take her Board examination. Ultimately, the disability discrimination endured by Plaintiff caused
23  Plaintiff financial harm by delaying her ability to start work on time with her peers.

24       65.   In September 2023, Plaintiff contacted OPHD, and made a telephonic report of the
25  incidents of disability discrimination she endured in Neurology.

26  ///
27  ///
28  ///

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**(Violation of Title II of the Americans with Disabilities Act ("ADA")**

**(42 U.S.C. §§ 12101 et seq.))**

**(Against the Regents and DOES 1 through 10.)**

66.     Plaintiff realleges and incorporates by reference as set forth fully herein all foregoing paragraphs of this Complaint.

67.     "To establish a violation of Title II of the ADA, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) she was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities, and (3) such exclusion or discrimination was by reason of her disability." (*Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2013).) In *Hason*, the court held that Title II of the ADA applies to disability discrimination by a state licensing agency like the Medical Board of California in denying an application for professional licensure by a physician on the basis of a mental disability. *(Hanson v. Med. Board of California*, 279 F.3d 1167, 1173 (9th Cir. 2002).)

68.     Plaintiff has a disability under 42 U.S.C. section 12131(2) because she suffers from several mental disabilities—ADHD, anxiety, adjustment disorder, and depression, all of which she was diagnosed with well in advance of May 2023, and her start of the third year of the Program.

69.     Plaintiff's disability could have been reasonably accommodated in that she requested slightly more time to complete certain tasks, as she had both in her undergraduate programs and masters programs without issue, and was denied this reasonable accommodation. Likewise, Plaintiff had received accommodations in the Program up until she began her Neurology rotation where she was blatantly told she would not succeed due to behaviors associated with her disability, was not offered accommodations, and was actually put in disadvantageous situations when compared to her peers solely because of her disability. Plaintiff was treated negatively due to her disability by her superiors. Plaintiff was excluded from participation by the Regents, and generally discriminated against with regard to activities and tasks within her Program.

70.     The Regents reason for exclusion and discrimination of Plaintiff in violation of the

**COMPLAINT**

1   ADA was exclusively because of Plaintiff's disability.

2       71.     The Regents violated the ADA when it failed to reasonably accommodate Plaintiff's

3   ADHD by allowing her a reasonable amount of extended time to complete certain tasks in the

4   Program.

5       72.     The Regents violated the ADA by failing Plaintiff exclusively because she had a

6   mental disability.

7       73.     The Regents violated the ADA by failing to offer Plaintiff the same learning

8   experiences as her non-disabled peers due to her disability.

9       74.     Plaintiff was harmed by the Regents' actions in violation of the ADA, namely,

10  because Plaintiff did not pass Neurology, she was required to delay the receipt of her pharmacy

11  degree; repeat the rotation; and pay for an extra semester. This delayed Plaintiff's ability to apply to

12  residency, and to take her Board examination.

13      75.     Ultimately, the Regent's discrimination against Plaintiff caused Plaintiff financial

14  harm by delaying her ability to start work on time with her peers.

15                          **SECOND CAUSE OF ACTION**

16  **(Violation of Section 504 of the Rehabilitation Act (29 U.S.C. § 794) ("Rehabilitation Act"))**

17                    **(Against the Regents and DOES 1 through 10.)**

18      76.     Plaintiff realleges and incorporates by reference as set forth fully herein all foregoing

19  paragraphs of this Complaint.

20      77.     "[U]nder Section 504 of the Rehabilitation Act [42 U.S.C. § 794], a plaintiff must

21  show: (1) he is an 'individual with a disability'; (2) he is 'otherwise qualified' to receive the benefit;

22  (3) he was denied the benefits of the program solely by reason of his disability, and (4) the program

23  receives federal financial assistance." (*Weinreich v. Los Angeles County Metropolitan Transp.*

24  *Authority,* 114 F.3d 976, 978 (9th Cir. 1997).) Plaintiff is informed and believes and on the basis of

25  such information and belief alleges that the Regents receive federal financial assistance.

26      78.     UCSF Pharmacy is a public university which receives funding from both the state

27  government of California and the federal government. UCSF's federal funding is sufficient to

28  invoke the coverage of Section 794. UCSF has received financial assistance at all times relevant to

1   the claims asserted in this Complaint.

2      79.   Plaintiff has a disability under Section 794 because she suffers from several mental

3   disabilities—ADHD, anxiety, adjustment disorder, and depression, all of which she was diagnosed

4   with well in advance of May 2023, and her start of the third year of the Program.

5      80.   Plaintiff's disability could have been reasonably accommodated in that she requested

6   slightly more time to complete certain tasks, as she had both in her undergraduate programs and

7   masters programs without issue, and was denied this reasonable accommodation. Likewise, Plaintiff

8   had received accommodations in the Program up until she began her Neurology rotation where she

9   was blatantly told she would not succeed due to behaviors associated with her disability, was not

10   offered accommodations, and was actually put in disadvantageous situations when compared to her

11   peers solely because of her disability. Plaintiff was treated negatively due to her disability by her

12   superiors. Plaintiff was excluded from participation by the Regents, and generally discriminated

13   against with regard to activities and tasks within her Program.

14      81.   The Regents reason for exclusion and discrimination of Plaintiff in violation of the

15   Rehabilitation Act was exclusively because of Plaintiff's disability.

16      82.   The Regents violated the Rehabilitation Act when it failed to reasonably

17   accommodate Plaintiff's ADHD by allowing her a reasonable amount of extended time to complete

18   certain tasks in the Program.

19      83.   The Regents violated the Rehabilitation Act when it failed Plaintiff in her Neurology

20   rotation exclusively because she had a mental disability.

21      84.   The Regents violated the Rehabilitation act when it failed to offer Plaintiff the same

22   learning experiences as her non-disabled peers due to her disability.

23      85.   Plaintiff was harmed by the Regents' violative acts, namely, because Plaintiff did not

24   pass Neurology, she was required to delay the receipt of her pharmacy degree; repeat the rotation;

25   and pay for an extra semester. This delayed Plaintiff's ability to apply to residency, and to take her

26   Board examination.

27      86.   Ultimately, the Regent's discrimination in violation of the Rehabilitation Act caused

28   Plaintiff financial harm by delaying her ability to start work on time with her peers.

**THIRD CAUSE OF ACTION**

**(California Government Code § 11135 et seq.)**

**(Against the Regents and DOES 1 through 10.)**

87.     Plaintiff realleges and incorporates by reference as set forth fully herein all foregoing paragraphs of this Complaint.

88.     Section 11135 of the California Government Code ("Section 11135"), subsection (a) provides in relevant part: "No person in the State of California shall, on the basis of . . . disability, be unlawfully denied the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is funded directly by the state or receives any financial assistance from the state.

89.     UCSF Pharmacy is a public university which receives funding from both the state government of California and the federal government. UCSF's state funding is sufficient to invoke the coverage of Section 11135. UCSF has received financial assistance at all times relevant to the claims asserted in this Complaint.

90.     Section 11135(b) incorporates the protections and prohibitions contained in the Americans with Disabilities Act ("ADA") and its implementing regulations. Section 11135(b) states in relevant part:

> "With respect to discrimination on the basis of disability, programs and activities subject to subdivision (a) shall meet the protections and prohibitions contained in Section 202 of the federal Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof, except that if the laws of this state prescribe stronger protections and prohibitions, the programs and activities subject to subdivision (a) shall be subject to the stronger protections and prohibitions."

91.     For all the reasons pled above under the First and Second Causes of Action of this Complaint, as well as throughout this Complaint itself, the Regents have violated and continue to violate the ADA and therefore have violated and continue to violate Section 11135(b).

92.     Pursuant to California Government Code § 11139, Plaintiff has a private right of action to enforce Section 11135(b).

93.     The Regents and their agents and employees have and continue to violate California

Section 11135 by unlawfully denying Plaintiff the benefits of, and unlawfully subjecting Plaintiff to

discrimination under, the Regents programs and activities and for the reasons set forth above.

94.     The Regents have refused and failed to provide Plaintiff with full and equal access to

their facilities, programs, services and activities as required by Section 11135.

95.     The Regents reason for exclusion and discrimination of Plaintiff in violation of

Section 11135 was exclusively because of Plaintiff's disability.

96.     The Regents violated Section 11135 when it failed to reasonably accommodate

Plaintiff's ADHD by allowing her a reasonable amount of extended time to complete certain tasks

in the Program.

97.     The Regents violated Section 11135 when it failed Plaintiff in her Neurology

rotation exclusively because she had a mental disability.

98.     The Regents violated Section 11135 when it failed to offer Plaintiff the same

learning experiences as her non-disabled peers due to her disability.

99.     Plaintiff was harmed by the Regents' violative acts, namely, because Plaintiff did not

pass Neurology, she was required to delay the receipt of her pharmacy degree; repeat the rotation;

and pay for an extra semester. This delayed Plaintiff's ability to apply to residency, and to take her

Board examination.

100.    Ultimately, the Regent's discrimination in violation of Section 1135 caused Plaintiff

financial harm by delaying her ability to start work on time with her peers.

## FOURTH CAUSE OF ACTION

**(Violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.) ("Title VI")**

**(Against All Defendants—the Regents; PMG; KFHP; Kaiser Permanente San Rafael Medical**

**Center; Kaiser Permanente Medical Offices; and DOES 1 through 10.)**

101.    Plaintiff realleges and incorporates by reference as set forth fully herein all foregoing

paragraphs of this Complaint.

102.    Title VI states that, "No person in the United States shall, on the ground of race,

color, or national origin, be excluded from participation in, be denied the benefits of, or be

1   subjected to discrimination under any program or activity receiving Federal financial assistance."

2   (42 U.S.C. § 2000d; *Gratz v. Bollinger*, (2003) 539 U.S. 244, 260; *Students for Fair Admissions,*

3   *Inc., v. President & Fellows of Harvard Coll.,* (2023) 600 U.S. 181.)

4       103.    Plaintiff is a citizen of the United States and a resident of San Jose, California.

5       104.    Plaintiff is a Palestinian-American, female who has black/dark brown hair; brown

6   eyes; and olive skin. Throughout Plaintiff's life, individuals have assumed that she is of East-

7   Asian/Indian descent.

8       105.    UCSF Pharmacy is a public university which receives funding from both the state

9   government of California and the federal government. UCSF's state funding is sufficient to invoke

10  the coverage of Title VI . UCSF has received financial assistance at all times relevant to the claims

11  asserted in this Complaint.

12      106.    PMG, KFHP, Kaiser Permanente San Rafael Medical Center; and Kaiser Permanente

13  Medical Offices all receive funding from the federal government.

14      107.    Defendants violated Title VI by taking adverse actions against Plaintiff with the

15  intent to discriminate against her on the basis of her race, color and perceived national origin

16  (perceived as Indian). She was consistently treated inferiorly in the Program on account of her

17  "Indian smell" and Program leadership took actions based upon the false stereotypical statements of

18  technicians in the Program who accused Plaintiff of having an "Indian smell." Specifically, the

19  following are some of the actions taken by Defendants against Plaintiff due to her race, color and

20  perceived national origin:

- Defendants required Plaintiff to dry-clean her clothing/white coat, and come to work
  with a bag of clean clothing, other than the clothing she had on her person, to change
  into every day due to her "Indian smell."

- Defendants required Plaintiff to rotate one day out of the week at another Kaiser location
  due to her alleged "Indian smell."

- Defendants subjected Plaintiff to a daily "scent test" whereby her supervisors smelled
  her every morning when she arrived at the workplace before being permitted to enter the
  workspace with the rest of her colleagues and peers.

1   • Defendants advised Plaintiff to stay away from other people in her workspace due to her
2    "Indian smell."

3   • Defendants ignored, minimized, and/or entirely disregarded Plaintiff's complaints about
4    the racial discrimination. Instead, Defendants advised Plaintiff to handle the situation on
5    her own.

6   • Defendants allowed Plaintiff to be harassed and berated on the basis of her race and
7    color without consequence to the harassers. On at least one occasion Plaintiff was
8    approached from behind by a technician who called her an "Indian," before abruptly
9    walking away. The comment was a racial slur based upon Plaintiff's skin color and
10   outward racial appearance. Defendants advised Plaintiff that she should "understand
11   where the technician is coming from," in spite of the fact that other leadership reassured
12   Plaintiff that she did not have a smell of any kind.

13   • Defendants prohibited Plaintiff from working inside the pharmacy with the rest of her
14   coworkers when the technicians were present due to her "Indian smell." Plaintiff was
15   required to work outside of the pharmacy delivering prescriptions.

16   • Defendants required Plaintiff to stand within the confines of a duct-taped barrier on the
17   floor of the pharmacy when entering to obtain prescriptions for her delivery job. She was
18   not permitted to leave that space because of her "Indian smell." Likewise, Defendants
19   required Plaintiff to stand only within the confines of duct-tape in the locker room when
20   putting her valuables and personal belongings away for safe-keeping for the day due to
21   her "Indian smell."

22   • Just two weeks before she was set to finish her rotation at Kaiser Community,
23   Defendants informed Plaintiff that she was no longer permitted to work there, and that
24   she needed to find an alternative work site due to her "Indian scent." Defendants
25   required Plaintiff to float at three separate pharmacies in the last two weeks of her
26   rotation because of her "Indian scent."

27   • Defendants required Plaintiff to drive around in the car for a full work day with S.H. so
28   that S.H. could assess Plaintiff's "Indian scent."

1       •    Plaintiff is aware that Defendants treated other dark-skinned individuals poorly in ways

2             similar to the ways Plaintiff was treated as a result of their racial appearance and color.

3       108.    Defendants treated Plaintiff differently and knowingly caused Plaintiff harm in the

4 ways described above solely because of her race, color, and perceived national origin as being from

5 India.

6       109.    As a result of Defendants' violations of Title VI, Plaintiff has suffered and will

7 continue to suffer actual damages, including lost earnings. Some damages include that she was

8 required to delay the receipt of her pharmacy degree; repeat the rotation; and pay for an extra

9 semester. This delayed Plaintiff's ability to apply to residency, and to take her Board examination.

10       110.    This constitutional deprivation resulted in economic and emotional distress injuries

11 to Plaintiff including lost profits, loss of earnings, and other actual damages. Plaintiff has also

12 suffered damages for both mental anguish and emotional distress.

13 **FIFTH CAUSE OF ACTION**

14 **(Unruh Civil Rights Act)**

15 **(Against PMG; KFHP; Kaiser Permanente San Rafael Medical Center; Kaiser Permanente**

16 **Medical Offices; and DOES 1 through 10.)**

17       111.    Plaintiff realleges and incorporates by reference as set forth fully herein all foregoing

18 paragraphs of this Complaint.

19       112.    Plaintiff is a Palestinian-American, female who has black/dark brown hair; brown

20 eyes; and olive skin. Throughout Plaintiff's life, individuals have assumed that she is of East-

21 Asian/Indian descent.

22       113.    Defendants PMG, KFHP, Kaiser Permanente San Rafael Medical Center, and Kaiser

23 Permanente Medical Offices (collectively the "Kaiser Defendants") denied Plaintiff full and equal

24 accommodations, advantages, facilities, privileges, and services because of her race, color, and

25 ancestry.

26       114.    The Kaiser Defendants discriminated against Plaintiff such that she was denied full

27 and equal accommodations, advantages, facilities, privileges, and services. Specifically, Plaintiff

28 was denied equal opportunity at her rotation sites on the grounds that she had an alleged "Indian

- 23 -
**COMPLAINT**

1   smell." The following are some of the actions summarized above that the Kaiser Defendants took

2   against Plaintiff: she was made to change into new clothing at the beginning of her day; launder her

3   white coats in excess; work in different places than the rest of the pharmacy staff; work outside of

4   the pharmacy facility; and ultimately in her final week she was asked to leave the facility and work

5   elsewhere. Plaintiff ultimately had no choice but to move her entire schedule around to a different

6   geographical area so that she could avoid working for the Kaiser Defendants in completing her

7   rotations for the year. The actions described in Paragraph 92 of this Compliant generally sum up the

8   actions taken against Plaintiff by the Kaiser Defendants in violation of Unruh.

9        115.    The substantial motivating reason for the Kaiser Defendants' conduct was their

10   perception of Plaintiff's race, color and ancestry.

11        116.    Plaintiff was harmed by the Kaiser Defendants as a result of the aforementioned.

12        117.    The Kaiser Defendants' conduct was a substantial factor in causing Plaintiff's harm.

13   **IV.   PRAYER FOR RELIEF**

14        WHEREFORE, Plaintiff prays for judgment as follows with respect to all causes of action:

15        1.    For Compensatory Damages, including Mental and Emotional Distress, and other

16   Special and General Damages according to proof;

17        2.    Economic and Non-Economic Damages;

18        3.    Injunctive relief;

19        4.    Punitive Damages;

20        5.    For Attorney's Fees and Costs as permitted by law;

21        6.    For Prejudgment Interest at the applicable rate;

22        7.    Costs as permitted by law; and

23        8.    Such other further relief as the Court deems just and proper.

24   ///

25   ///

26   ///

27

28

1  **V.**     <u>**DEMAND FOR JURY TRIAL**</u>

2       Plaintiff hereby demands a jury trial on all issues so triable.

3

4     DATED: June 4, 2024          FENTON JURKOWITZ LAW GROUP, LLP

5

6                            By */s/ Nicholas Jurkowitz*

7                                  NICHOLAS JURKOWITZ
                                   ANNE SCHNEIDER

8                                  Attorneys for SANA KHATEEB

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 25 -

**COMPLAINT**